## UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **CASSANDRA JOHNSON-LANDRY** | ) | **CASE No: 18-55697LRC** |
| **DEBTOR** | ) | **CHAPTER 7** |
| | ) | |
| | ) | |
| **S. GREGORY HAYS, TRUSTEE** | ) | **CONTESTED MATTER** |
| **OBJECTOR** | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| **GEORGIA DEPARTMENT OF COMMUNITY HEALTH** | ) | |
| **CLAIMANT** | ) | |

*Filed in U.S. Bankruptcy Court*
*Atlanta, Georgia*

*NOV 18 2020*

*By _____ Regina Thomas, Clerk*
*Deputy Clerk*

## OBJECTION TO TRUSTEE WITHDRAWAL OF OBJECTION TO CLAIM NO. 20-1 FILED BY DCH

### 1

Debtor received Trustee's Withdrawal of Objections on November 16, 2020 which was dated submitted to the USBRC on November 4, 2020 (DOC 322). The Withdrawal of Objection was based on submitted Response by Claimant (Doc No 314) filed on September 25, 2020. The Claimant filed a Proof of Claim of behalf of Department of Community Health (DCH) Claim No 20-1. Trustee's Withdrawal was allegedly based on additional information provided the response allegedly at the hearing date of October 1, 2020.

### 2

On September 18, 2018 Claimant filed Claimed No 20-1 in the amount of $42, 634.37. Debtor objected to (DCH) submission of Ruling for Default Judgement. Debtor submitted the Objection for the Default Judgment on March 11, 2019 with ALL supporting documents.

3

The Denial for requested Default Judgement was granted Without Prejudice on April 24, 2019.
It appeared there was another opportunity to possibly reverse the Denial based on Documents
submitted by the Attorney General's on behalf of (DCH).

4

Given there were no supporting documentation submitted with Claim No 20-1 submitted
September 19, 2018 by the Attorney General's Office on behalf of DCH, Claimant was given the
opportunity to submit supporting documents to support the (Claim). A printout of A/R was
submitted as the Exhibit on February 21, 2019. The Initial Claim submitted by a Creditor should
include supporting documents upon the initial submission in addition to current accurate
information. The A/R and Payer Number was partially removed via white out. There was not
detailed printout of items submitted in addition, to missing dates and year, (EXHIBIT A)

5

On August 26, 2020 Chapter 7 Trustee requested the USBRCND to disallow Claim No 20-1 in its
entirety. The assigned Trustee allowed Claimant to submit supporting evidence MONTHS after
the Initial claim was submitted which is a legitimate reason for objection pertaining to the
Creditor Initial Claim and grounds for objection regarding the Withdrawal of Objection by the
Chapter 7 Trustee by the Debtor. Alliance for Change through Treatment LLC. was abandoned
by the Trustee prior to Trustee Withdrawal of Objection.

6

The Assistant Attorney General continues slanderous and false terms such as Fraudulent and
Misrepresentation, when in fact the (DCH) has proven to provide the accurate depiction of such
wording based on the unethical behaviors pertaining to the modification/deletion of testimony
during Debtors Administrative Hearing due to the termination of Debtor's Mental Health
Agency's Providers Medicaid Numbers.

7

The total legal process should have never taken place due to (DCH) premeditated plans to
eliminate Debtor as a Medicaid Provider based on key incriminating evidence currently being
held by Debtor, which would incriminate many officials and previous business partner who

abandoned the agency. Based on the modified transcripts the Debtor's Administrative Hearing was unjust and unlawfully ruled as a non-retaliation. The Debtor's previous Attorney Dorian Murry Esq. Validated the modification in his Post Summary Brief was also filed by Debtor of March 11, 2019. Civil Action No 2015-CV-269501 was filed on 12/22/2015 which is the assigned case number for the Lawsuit filed on behalf of Dorian Murry who was representing Alliance for Change through Treatment LLC. May also be a factor in the Chapter 7 Trustee's Withdrawal of Objection. According to the FC Superior Court System there is a Stay position. Attorney Murry withdrew from referenced case on November 2, 2017, which was The Debtors Birthday and one day after the death of the driver of the vehicle who hit the Debtor in May of 2017 at no fault of her own. (EXHIBIT B)

8

The amount within the Lawsuit was 30 million dollars. I will continue to address this issue because the Debtor is aware of a high probability the 30 million dollars was taken by a select group in individuals involved with Debtors Administrative Hearing, Audits and more. In addition, the Debtor was provided with a verbal information by a witness with knowledge regarding this lawsuit Civil Action No 2015-CV-269501 and the missing money. Unfortunately, this individual who was shortly afterwards found deceased.

9

Claimant attempted to utilized portion of the Medicaid Manual without the identification of date and year of the Provider's Manual to support submitted DCH Claim etc. However, Debtor located the referenced manual which was dated October 1, 2020 which is not applicable to Debtor. Alliance for Change through Treatment is a Limited Liability Company, which is separate from Cassandra Johnson-Landry, Debtor, therefore during the operation of the agency all monies were paid to Alliance for Change through Treatment LLC. Cassandra Johnson-Landry, Debtor DOES NOT own DCH money for payback. There were audit findings which were appealed. Debtor submitted supporting documents including emails which were filed on March 11. 2019 given directives to Providers regarding resubmission of NCCI Edits. (EXHIBIT C)

10

The amount of $42, 634.37 is not owed. The Claimant is fully aware of the illegal activity by (DCH) and the attempts by (DCH) Legal Counsel to settle with Debtor during the Administrative Hearing(s). Debtor is resubmitting supporting documents. If Debtor illegally resubmitted claims, (DCH) would not have provided proposed various settlement agreements which were also submitted in supporting documents prior.

11`

Claimant also provided false explanation of claims, referring to them as Medicaid Adjustments
and creates the illusion the Debtor habitually resubmitting claims, based on the above
information regarding automobile accidents and more, it is very apparent Claimant attempts to
present Debtor as fraudulent which has damaged her career and reputation. The last three
Audits were facilitated by Auditors who were directed to ensure Debtor failed each audit in
order to terminate the Letter of Agreement which was later discovered to be signed illegally. Ad
Hoc Audit Protocols dates were altered for the purpose of auditing Debtor's agency (EXHIBIT D )

12

The Claimant refers to Part 1 Chapter 100 of the Georgia Medicaid Manual (Doc 314)
September 25, 2020, Given the Debtor's has maintained all Manuals to include (Georgia
Medicaid and Previous APS. Debtor compared the Policy and Procedures to previous manuals
ranging from 2012 to current. Claimant in paragraph 8 does not refer to the year nor does she
refer to which Manual as there are several for Medicaid Providers. Debtor cross referenced
previous Manuals in possession and there have been extensive modifications, changes,
eliminations with dates of revisions back to 2012. Many initial Policies and Procedures were not
present in Georgia Medicaid Manuals pertaining to the Debtor.

13

It appears the A/R includes audit findings and NOT resubmission of claims, but as stated
Providers were directed to resubmit NCCI Edits based on communication by DCH administration
which was previously uploaded by Debtor. On November 3. 2016 communication was sent to
DCH regarding the amount which was filled in by the DCH staff. I spoke to the HP staff regarding
the amount allegedly owed and requested Proof of submission and explanation of the amount.
Based on the previous communication from the DCH Administration, informing Providers if
resubmission were not submitted timely the agency would be penalized. This information was
also submitted. The HP staff informed the Debtor, inquiring on behalf of the agency there were
no penalizations towards the agency. Furthermore, it's very apparent the Debtor is
experiencing continued retaliation and is not liable for any such paybacks. Again, if the agency
was responsible for Paybacks why did DCH attempt to submit settlement offers after the
Administrative Hearing which would provide the Provider with a new Medicaid Number and no
paybacks. Again, the Alliance for Change Letter of Agreement was illegal which explained why
DCH wanted to provide Alliance for Change through Treatment with a new Medicaid Number.
(EXHIBIT E).

14

As stated previously, Whitney Groff Esq, AAG is a conflict regarding Debtor's Bankruptcy Case. Evidence has been submitted regarding her previous employment with Aldrige Pite and McCalla Raymer Law firms. Both Law firms were assigned to my personal property which were abandoned by the Chapter 7 Trustee and Foreclosed on which has left both Debtor and spouse transient. This individual has caused self -injury and harm to Debtor's Family. Her connection and role in a pre-planned agenda to assist in totally Bankrupting Debtor's Estate is obvious and has caused significant harm.  Possible Ex Parte communication affecting Debtor's Case is a factor.

Debtor requests the Court to Trustee Chapter 7 Withdrawal of Objection of Claim Number 20-1.

17th Day of November 2020

Cassandra Johnson-Landry, Pro Se
678.860.3621

## UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF GEORGIA

## CERTIFICATE OF SERVICE

I CASSANDRA JOHNSON-LANDRY, ATTEST TO BEING OVER THE AGE OF 18
YEARS. The current document **OBJECTION TO TRUSTEE WITHDRAWAL OF
OBJECTION TO CLAIM NO, 20-1 FILED BY DCH IS REQUESTED TO BE
SUBMITTED TO ALL REGISTERED INDIVIDUALS ON Debtor's Bankruptcy Matrix.**

**Submitted on**

**17th Day of November 2020.**

**Cassandra Johnson-Landry, Pro Se**
**678.860.3621**

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA

2019 MAR 11 PM 3:41

M. REGINA THOMAS
CLERK
BY _____

| | | |
|---|---|---|
| CASSANDRA JOHNSON-LANDRY | * | Chapter 7 |
| Debtor | * | Case No. 18-55697-lrc |
| | * | |
| | * | |
| GEORGIA DEPARTMENT OF | * | Adv. NO 18-05340-lrc |
| COMMUNITY HEALTH | * | |
| Plaintiff | * | |
| | * | |
| | * | |
| V. | * | |
| | *' | |
| CASSANDRA JOHNSON-LANDRY | * | |
| Defendant | * | |

## OBJECTION TO ENTRY OF DEFAULT JUDGEMENT

COMES NOW Cassandra Johnson-Landry, Debtor and Defendant regarding
Case No 118-55697-lrc and Adversary Action 18-05340-lrc.

### 1.

According to assigned counsel Department of Community Health filed an
Adversary Proceeding on December 17, 2018 regarding the "frivolous
allegations" of overpayments by the Department of Community Health known
as, "The Department".

1

## 2.

According to assigned counsel a Summons was issued on December 18, 2018 which required a Motion to be filed within a 30 day time frame. On December 20, 2018 "supposedly" documents were mailed via US POSTAL SERVICE first class mail and NOT CERTIFIED with Return Receipt.

## 3.

The Defendant DID NOT receive stated documents on said date which explains why the "allegedly" mail documents were not answered.

## 4.

Department of Community Health aka "The Department" filed a request for Entry of Default. Given the Defendant did not receive said documents by law, the dependent Due Process was not provided.

## 5.

The Defendant was a Medicaid Provider and was instructed to resubmit UNPAID Medicaid claims as instructed by the DCH Commissioner for year identified. Medicaid Providers throughout the state were sent emails regarding this process. The Defendant did NOT receive overpayments. You

2

do not receive overpayments when you never received the initial payments. The State of Georgia was not reimbursing providers as required by federal guidelines for services performed in conjunction with other services. This was a tactic by the State of Georgia to reroute money for possible misuse. The Overpayment was appealed during the stated year. Due to the number of Medicaid Providers who was being penalized for following DIRECTIVES and who also appealed, I did also. I met with a representative from Hewlett Packard who briefed me on the process. This was after she informed me, she was given directives by, then Commissioner Clyde Reese to me with providers. It appears the STATE and the DEPARTMENT utilized this process to obtain needed money for federal pay back as required.

## 6.

There was no overbilling of 42,634.37. The Department is continuing to retaliate as directed. Due to my testimony against the state of Georgia for my 5 year old client and after the state uncovered both myself and spouse was victim of Mortgage Fraud and more, the plan to remove "ME PERSONALLY" was created. The original transcripts from the agency's Administrative Hearings were edited and statements made by State Staff were deleted, such as the confessions of two state employees identifying both the

DHR and DHS Commissioners providing directives to resolve my agency and also holding after hour meetings via Google regarding my agency. Not to mention I was hit two times AFTER MY agency was penalized 25,000.00 citing during an Ad Hoc Audit my charts were "2" minutes late and there was no internet access. The Auditors were informed of problems with our internet service "PRIOR".

## 7.

The additional payments were owed to the agency due to the NCCI edits all provided were instructed to resubmit, due to being denied upon initial entry. Due to the lack of training many providers were attempting to obtain information from the Peach care Manuals, however, the manuals were not consistent for example the NCCI Edits were not noted in particular versions, however reference to NCCI submissions were placed in an updated manual noted as a REVISION. How, could you revise an item when there was never an initial policy or procedure? Not to mention this was a calculated task.

## 8.

The representing counsel for the "Department" is functioning in a HIGHLY conflictual relationship as it relates to all proceeding for the above Defendant

4

and Plaintiff. There are relationships with law firms which are currently involved with identified cases in addition to affiliations with the United Stated Bankruptcy Court of Northern Georgia. The counsel was strategically assigned to referenced case in order to damage EVERY aspect of the plaintiffs and defendant's career and life, in addition to both professional and personal relationships.

## 9.

Of course I would not receive stated items, with the exception of the item connected to this response. This was planned and strategically planned. I am objecting to any and all consideration for proposed default Judgement:

1. Not receiving alleged documents/Motions etc.
2. Representing Counsel Relationships with previous employment/internship with Law firms which are connected to this case such as Aldridge LLP, McCalla Raymer and US BRC Northern District Chapter 13. Having access to information regarding the Debtor /Defendant is unethical causing a bias view.
3. No merit regarding the total amount stated as well as proof and clarity for alleged paybacks.

4. Continue retaliation against Debtor/Defendant in order to assist OTHERS to exhaust and damage both personal and business financially.

5. Ability to access inside information creating bias regarding current case.

6. Facilitating harm to Debtor/Defendant Physically, Mentally and Emotionally.

7. This HIGHLY unethical tactic serves as an additional catalyst to cover ALL wrongdoing by ALL involved state offices, state officials and to derail the previous lawsuit filed against the State Departments and Auditing Entities, due to the verifiable proof.

(Exhibits supports the above objections were previously submitted under file Claim.

Submitted

Cassandra Johnson-Landry, Pro Se
P.O Box 1725
Grayson, Georgia 30017

## CERTIFICATE OF SERVICE

I Cassandra Johnson-Landry currently submits Objection to Proposed
Default Judgement. Sent via first Class Mail service via USPS. I am over the
age of 18 years. Submission of document:

**Whitney Groff, Esq**
**Assistant Attorney General**
**40 Capital Square, SW**
**Atlanta, Georgia 30334**

This day 11th of March 2019

Submitted

Cassandra Johnson-Landry, Pro Se
P.O Box 1725
Grayson, Georgia 30017

7

Case 18-55697-lrc    Doc 158-1    Filed 02/21/19    Entered 02/21/19 15:58:19    Desc
Exhibit A & B    Page 5 of 24

Case 18-55697-lrc    Claim 20-1 Part 2    Filed 09/19/18    Desc Account Statement
Page 1 of 1

| AR Number | Parcel Number | Payee Name | Fund | BES Code | AR Amount | Disposition | Outstanding Balance | DXC Case # | Reason |
|---|---|---|---|---|---|---|---|---|---|
| 9318 | 294A | Alliance for Change Through Treatment, LLC | 0210 | 0009 | $22,327.60 | $3,554.56 | $19,272.65 | 010154D14 | Receivable - Audit Finding |
| 9111 | 294A | Alliance for Change Through Treatment, LLC | VAILS | 0080 | $17,127.40 | $0.00 | $17,127.40 | | Receivable - DXC Claim Adjustments |
| 12374 | 294A | Alliance for Change Through Treatment, LLC | VAILS | 0080 | $4,246.15 | $0.00 | $4,246.15 | | Receivable - DXC Claim Adjustments |
| 9319 | 594A | Alliance for Change Through Treatment, LLC | 0010 | 0005 | $1,519.63 | $119.33 | $1,400.30 | OXG15-02144 | Receivable - Finance Fee |
| 7902 | 294A | Alliance for Change Through Treatment, LLC | VAILS | 0080 | $449.37 | $0.00 | $449.37 | | Receivable - DXC Claim Adjustments |
| | | | | | | | $42,494.57 | | |

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:

CASSANDRA JOHNSON LANDRY.

               Debtor,

GEORGIA DEPARTMENT OF
COMMUNITY HEALTH,

               Plaintiff,

v.

CASSANDRA JOHNSON LANDRY,

               Defendant.

Chapter 7
Case No. 18-55697-lrc
Judge Lisa Ritchey Craig

Adv. No. 18-05340

## NOTICE OF VOLUNTARY DISMISSAL OF COMPLAINT
## WITHOUT PREJUDICE

COMES NOW, Plaintiff, the Georgia Department of Community Health, by and through

counsel, Christopher M. Carr, Attorney General for the State of Georgia, and voluntarily

dismisses its Complaint in the above-styled adversary proceedings without prejudice, pursuant to

Fed. R. Bankr. P. 7041 and Fed. R. Civ. P 41(a)(1)(A)(i).

This 9th day of September, 2019.

          Respectfully submitted,

          CHRISTOPHER M. CARR    112505
          Attorney General

          W. WRIGHT BANKS, JR.    036156
          Deputy Attorney General

          JULIE ADAMS JACOBS    003595
          Senior Assistant Attorney General

          */s/ Whitney Groff*
          WHITNEY GROFF    738079
          Assistant Attorney General

#1106536

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                          *
                                                *
CASSANDRA JOHNSON LANDRY.                        *        Chapter 7
                                                *        Case No. 18-55697-lrc
                        Debtor,                  *        Judge Lisa Ritchey Craig
                                                *
GEORGIA DEPARTMENT OF                            *
COMMUNITY HEALTH,                                *
                                                *        Adv. No. 18-05340
                        Plaintiff,               *
v.                                               *
                                                *
CASSANDRA JOHNSON LANDRY,                        *
                                                *
                        Defendant.               *

## WITHDRAWAL OF MOTION TO
## VOLUNTARILY DISMISS WITHOUT PREJUDICE

COMES NOW, Plaintiff, the Georgia Department of Community Health, by and through

counsel, Christopher M. Carr, Attorney General for the State of Georgia, and hereby withdraws

its motion to voluntarily dismiss complaint as the motion was intended to be filed in the

adversary proceeding instead of in the underlying case.

This 19th day of July, 2019.

                                        Respectfully submitted,

                                        CHRISTOPHER M. CARR        112505
                                        Attorney General

                                        W. WRIGHT BANKS, JR.       036156
                                        Deputy Attorney General

                                        JULIE ADAMS JACOBS         003595
                                        Senior Assistant Attorney General

                                        /s/ Whitney Groff                    .
                                        WHITNEY GROFF              738079
                                        Assistant Attorney General

#1108188

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                               *
                                     *
CASSANDRA JOHNSON LANDRY,            *     Chapter 7
                                     *     Case No. 18-55697-lrc
                    Debtor,          *     Judge Lisa Ritchey Craig
                                     *
_____   *
GEORGIA DEPARTMENT OF                *
COMMUNITY HEALTH,                    *
                                     *     Adv. No. 18-05340
                    Plaintiff,       *
                                     *
v.                                   *
                                     *
CASSANDRA JOHNSON LANDRY,            *
                                     *
                    Defendant.       *

*[PROPOSED]*
**DEFAULT JUDGMENT FOR THE**
**GEORGIA DEPARTMENT OF COMMUNITY HEATH**

The Georgia Department of Community Health filed this adversary proceeding to determine whether its claim against the Defendant is subject to discharge in the Defendant-Debtor's Chapter 7 bankruptcy case. Defendant-Debtor failed to file an answer to the adversary proceeding. The Clerk of Court entered a default on March 4, 2019. The Georgia Department of Community Health filed a Motion for Entry of Default Judgment in the above-styled adversary case. There being no response filed by the deadline and the Court having considered the motion and determined that it should be granted. It is hereby,

**ORDERED** that the debt owed to Plaintiff, the Georgia Department of Community Health, by the Defendant-Debtor, Cassandra Johnson Landry, for $42,634.37 is excepted from discharge, pursuant to 11 U.S.C. § 523(a)(2). It is further,

**ORDERED** that Defendant-Debtor's discharge under Chapter 7 as to the debt owed to the Department is denied, pursuant to 11 U.S.C. § 727(b). It is further,

**ORDERED** that judgment is entered against Defendant-Debtor in favor of the Department in the total amount of at least $42,634.37, plus civil penalties, damages, interest, attorney fees and costs, pursuant to O.C.G.A. § 49-4-168.1(c).

[END OF DOCUMENT]

Prepared and Presented by:

/s/ Whitney Groff
Whitney Groff, Ga. Bar No. 738079
Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 651-9457
Attorney for Georgia Department of Community Health

# EXHIBIT B

## Cases

**2015CV269501**
ALLIANCE FOR CHANGE THROUGH TREATMENTVS.APS HEALTHCARE BETHESDA,UNIVERSAL AMERICAN CORPORATION,JOHN DOE I - IV,JOHN DOE AGENCY I - IV

| File Date | Type | Status |
|---|---|---|
| 12/22/2015 | DAMAGES | Stayed |

FILED 11/7/2017 11:59 AM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

Alliance for Change Through Treatment, LLC.,   *
                                      *       Civil Action No.: 17-CV-9498 - 3
      Petitioner,   *
                                        *
            vs.   *
                                        *
Department of Community Health,   *
      Respondent.   *

### ORDER

The motion of Dorian Murry, Esquire, Attorney of record for the Petitioner Alliance for

Change Through Treatment, LLC, to withdraw as Attorney of record having been read and

considered;

For good cause shown, it is hereby ORDERED AND ADJUDGED that Dorian Murry,

Esquire, is hereby relieved as Attorney of Record for the Petitioner Alliance for Change Through

Treatment, LLC.

It is so ORDERED this _____ 8 _____ day of _____ Nov _____ 20 17.

                                  THE HONORABLE CLARENCE F. SEELIGER
                                  JUDGE, Superior Court
                                  Stone Mountain Judicial Circuit

Order Prepared by:
Dorian Murry
Georgia Bar # 532447
5300 Memorial Drive, Suite 130
Stone Mountain, Georgia 30083
(770) 450-0123 - (404) 581-5644 Facsimile

SNH

 # THE MURRY LAW GROUP, P.C.

*Attorneys at Law*

September 14, 2017

*Via Email: theraess@aol.com, Regular Mail, and Certified Mail Return Receipt Requested*

Alliance of Change Through Treatment
c/o Cassandra Johnson-Landry
3547 Habersham at Northlake, Building F
Tucker, GA 30084

> **Re:**   **Alliance for Change Through Treatment, LLC v. Department of Community Health**
> **Civil Action No.: 17CV9498**
> **Notice of Intent to Withdraw**

Dear Ms. Landry:

I intend to withdraw from representing you in the above-referenced matter. If I withdraw:

a) The DeKalb County Superior Court will retain jurisdiction of the action;
b) You will have the burden of keeping the court informed respecting where notices, pleadings, or other papers may be served;
c) You will have the obligation to prepare for trial or hire other counsel to prepare for trial;
d) There are no scheduled proceedings. We filed the petition for judicial review on September 5, 2017. The Department of Community Health was served on September 13, 2017;
e) You may be served notices at your last known address, 3547 Habersham at Northlake, Building F, Tucker, Georgia 30084; and
f) You have the right to object within 10 days of the date of this notice.

Sincerely,

DORIAN MURRY

# EXHIBIT C

# PART I
# POLICIES
# AND
# PROCEDURES
# FOR
# MEDICAID/PEACHCARE FOR KIDS



**Georgia Department of Community Health**

**Division of Medicaid**

**Revised: January 1, 2012**

denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

D) Provide services in compliance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. Section 504 provide that no otherwise qualified handicapped individual shall solely by reason of his or her handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

E) Not contact, provide gratuities or advertise "free" services to Medicaid or PeachCare for Kids members for the purpose of soliciting members' requests for services. Any activity such as obtaining a list of Medicaid or PeachCare for Kids members or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members is prohibited. Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited. It is not the intent of this provision to interfere with the normal pattern of quality medical care that results in follow-up treatment. Direct contact of patients for follow-up visits is not considered solicitation, nor is an acknowledgment that the provider accepts Medicaid/PeachCare for Kids patients.

F) Allow Medicaid or PeachCare for Kids members the opportunity to choose freely among available enrolled providers. It is not the intent of this provision to preclude referrals to other enrolled providers when medically necessary.

G) Not engage in any act or omission that constitutes or results in over utilization of services.

H) Not intentionally or negligently damage or endanger the health, safety, or welfare of any Medicaid or PeachCare for Kids member.

I) Not bill the Division for an amount greater than the lowest price regularly and routinely offered to any segment of the general public for the same service or item on the same date of service or accepted from other third party payers.

J) Neither bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered.

K) Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice.

L) Accept responsibility for every claim submitted to the Division that bears the provider's name or Medicaid/PeachCare for Kids provider number. Submission of a claim by a provider or his agent, acceptance of a Remittance

# PART I
# POLICIES
# AND
# PROCEDURES
# FOR
# MEDICAID/PEACHCARE FOR KIDS



## Georgia Department of Community Health

## Division of Medicaid

**Revised: April 1, 2013**

Rev. 01/06    **106.    General Conditions of Participation**

As general conditions of participation, all enrolled providers must:

A) Be fully licensed without restriction and certified under all applicable state and federal laws to perform the services in the applicable category of service, maintain current (non-delinquent) licenses and certifications required for the provision of such services, and inform the Division in writing immediately upon the expiration, suspension, probation, limitation or revocation of any such license or certification.

Rev. 10/04

Rev. 01/06

Rev. 04/05    1) A restriction shall be defined as:
   - A public reprimand;
   - Any period of probation, regardless of whether said period of probation is subject to terms and conditions;
   - The requirement of compliance with any terms and conditions, as administered by any licensing board, such that said compliance would allow the provider to practice in his or her trade;

Rev. 01/06
   - A suspension of any license for any period;
   - A limit or restriction on any license, including, but not limited to, monitoring of the provider's work by a another professional and/or the submission of reports detailing job performance or mental/physical fitness for duty to any entity (a provisional license issued during license application is not considered a restriction for a home health provider);
   - A license revocation;

Rev. 07/05
   - The application of a penalty or the withholding of formal disposition based upon the provider's submission to the care, counseling, or treatment of physicians or other professional persons, and the completion of such care, counseling or treatment.

Rev. 04/05    2) As licensure relates to the operation of personal care homes that meet a business need for the Department, an initial provisional license without restriction issued as part of the application process for a license to operate a personal care home shall not be considered a restriction.

Rev. 10/05    3) Ensure that all licensed professional personnel providing services to members through a provider's number are fully licensed without restriction as defined in §106(A)(1). All licensed professional personnel must meet all standards for full licensure in their respective field.
Rev. 01/06

B) Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

C) Provide services in compliance with Title VI of the Civil Rights Act of 1964 as amended which provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be

Rev. 01/06    **106.    General Conditions of Participation**

As general conditions of participation, all enrolled providers must:

A) Be fully licensed without restriction and certified under all applicable state and federal laws to perform the services in the applicable category of service, maintain current (non-delinquent) licenses and certifications required for the provision of such services, and inform the Division in writing immediately upon the expiration, suspension, probation, limitation or revocation of any such license or certification.

Rev. 10/04

Rev. 01/06

Rev. 04/05

1) A restriction shall be defined as:
   - A public reprimand;
   - Any period of probation, regardless of whether said period of probation is subject to terms and conditions;
   - The requirement of compliance with any terms and conditions, as administered by any licensing board, such that said compliance would allow the provider to practice in his or her trade;
   - A suspension of any license for any period;
   - A limit or restriction on any license, including, but not limited to, monitoring of the provider's work by a another professional and/or the submission of reports detailing job performance or mental/physical fitness for duty to any entity (a provisional license issued during license application is not considered a restriction for a home health provider);
   - A license revocation;
   - The application of a penalty or the withholding of formal disposition based upon the provider's submission to the care, counseling, or treatment of physicians or other professional persons, and the completion of such care, counseling or treatment.

Rev. 01/06

Rev. 07/05

2) As licensure relates to the operation of personal care homes that meet a business need for the Department, an initial provisional license without restriction issued as part of the application process for a license to operate a personal care home shall not be considered a restriction.

Rev. 04/05

3) Ensure that all licensed professional personnel providing services to members through a provider's number are fully licensed without restriction as defined in §106(A)(1). All licensed professional personnel must meet all standards for full licensure in their respective field.

Rev. 10/05

Rev. 01/06

B) Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

C) Provide services in compliance with Title VI of the Civil Rights Act of 1964 as amended which provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

D) Provide services in compliance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. Section 504 provide that no otherwise qualified handicapped individual shall solely by reason of his or her handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

E) Not contact, provide gratuities or advertise "free" services to Medicaid or PeachCare for Kids members for the purpose of soliciting members' requests for services. Any activity such as obtaining a list of Medicaid or PeachCare for Kids members or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members is prohibited. Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited. It is not the intent of this provision to interfere with the normal pattern of quality medical care that results in follow-up treatment. Direct contact of patients for follow-up visits is not considered solicitation, nor is an acknowledgment that the provider accepts Medicaid/PeachCare for Kids patients.

F) Allow Medicaid or PeachCare for Kids members the opportunity to choose freely among available enrolled providers. It is not the intent of this provision to preclude referrals to other enrolled providers when medically necessary.

G) Not engage in any act or omission that constitutes or results in over utilization of services.

H) Not intentionally or negligently damage or endanger the health, safety, or welfare of any Medicaid or PeachCare for Kids member.

I) Not bill the Division for an amount greater than the lowest price regularly and routinely offered to any segment of the general public for the same service or item on the same date of service or accepted from other third party payers.

J) Neither bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered.

K) Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice.

L) Accept responsibility for every claim submitted to the Division that bears the provider's name or Medicaid/PeachCare for Kids provider number. Submission of a claim by a provider or his agent, acceptance of a Remittance

Rev. 04/13

Advice, or acceptance of claim payment constitutes verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division) and that the provider authorized submission of the claim for reimbursement. Remittance Advices shall be deemed accepted if the provider does not notify the Division or its third party administrator to the contrary in writing within ninety (90) days after their issuance. Payments shall be deemed accepted when cashed, negotiated, or deposited, including those payments deposited electronically.

M) Refund any overpayments or Advance Payments to the Division within required time frames.

Rev. 07/04

N) Accept the Division's payment as payment-in-full for covered services to patients accepted as Medicaid or PeachCare for Kids members. In most cases, this does not prohibit the provider from receiving reimbursement for covered services from liable third parties or other insurance plan. See Section 303.5 for special rules that apply to tort cases.

O) Deduct all payments for covered services received from third parties or other insurance plans from the amount billed to the Division for covered service(s) rendered and notify the Division regarding the existence of any other insurance or third party resource unless billing for managed care co-payment.

Rev. 10/03

Rev. 04/13

P) Agree not to seek or accept any payment whatsoever for covered services from the member or other interested party when the member was accepted as a Medicaid or PeachCare for Kids member. However, they are required to pay a co-payment for some services received. Further, no deposit may be required from the member or other interested party pending receipt of Division payment.

Q) Not seek reimbursement from the member or other interested party from claims submitted to the Division for which payments subsequently are denied, reduced, recouped, or refunded due to the provider's failure to comply with Divisional policies and procedures (e.g., timely submission of claims, incorrect billing, determination that services were not medically necessary, etc.) or due to the provider's receipt of payment from a third party.

Rev. 10/04

Rev. 10/06

R) Maintain such written records for Medicaid/PeachCare for Kids members as necessary to disclose fully the extent of services provided and the medical necessity for the provision of such services, for a minimum of five (5) years after the date of service. Providers should ensure that member records are forwarded to a member's new provider during a change of ownership, voluntary or involuntary termination, transfer of a member to a new provider or any other action that requires the review of member records to determine course of treatment. Member records must, at a minimum, reflect the date of service, member name and medical history, the service provided, the diagnosis and the prescribed drugs or treatment ordered, and the signature of

# PART I

# POLICIESANDPROCEDURES
# For
# MEDICAID/PEACHCAREFORKIDS



# GEORGIA DEPARTMENT OF COMMUNITY HEALTH

## DIVISION OF MEDICAID

October 1, 2020

(4) Within 35 days after any change in ownership of the fiscal agent

*Disclosures from managed care entities*
(1) Upon request of the Division;

(2) Upon submission of a proposal during the Division's procurement process;

(3) Execution, renewal, or extension of a contract with the Division;

(4) Within 35 days after any change in ownership with of the managed care entity.

### 105.17 Temporary Moratoria

Rev. 10/13

(1) Upon request from CMS, the Division shall impose temporary moratoria on enrollment of new providers or provider types identified by CMS as posing an increased risk to the Medicaid program.

(2) The Division is not required to impose such a moratorium if it determines that imposition of a temporary moratorium would adversely affect

(a) If the Division makes such a determination, it shall notify CMS writing.

(b)(1) The Division may impose temporary moratoria on enrollment of new providers or impose numerical caps or other limits that they identify as having a significant potential for fraud, waste, or abuse and that CMS has identified as being at high risk for fraud, waste, or abuse.

(b)(2) Before implementing the moratoria, caps, or other limits, the Division must determine that its action would not adversely impact members' access to medical assistance.

(3)     The Division shall notify CMS in writing in the event they seek to impose such moratoria, including all details of the moratoria; and obtain CMS's concurrence with imposition of the moratoria.

(a) The Division must impose the moratorium for an initial period of six (6) months.

(b) If the Division determines that it is necessary they may extend the moratorium in six (6) months increments.

(c) For each occurrence the Division must document in writing the necessity for extending the moratorium.

**106.** **General Conditions of Participation**

As general conditions of participation, all enrolled providers must:

A) Be fully licensed without restriction and certified under all applicable state and federal laws to perform the services in the applicable category of service, maintain current (non-delinquent) licenses and certifications required for the provision of such services, and inform the Division in writing immediately upon the expiration, suspension, probation, limitation or revocation of any such license or certification. Medical residents may enroll as prescribing physicians using their Residency Training Permit (RTP) only for the purpose of prescribing outpatient prescription medications.

Rev.01/15

Rev.07/15

Rev. 07/15

1) A restriction shall be defined as:
   - A suspension of any license for any period;
   - A license revocation;
   - A limit or restriction on any license which bars the provider from performing any applicable category of service;

2) As licensure relates to the operation of personal care homes that meet a business need for the Department, an initial provisional license without restriction issued as part of the application process for a license to operate a personal care home shall not be considered a restriction.

3) Ensure that all licensed professional personnel providing services to members through a provider's number are fully licensed without restriction as defined in §106(A)(1). All licensed professional personnel must meet all standards for full licensure in their respective field.

B) Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

C) Provide services in compliance with Title VI of the Civil Rights Act of 1964 as amended which provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

D) Provide services in compliance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. Section 504 provide that no otherwise qualified handicapped individual shall solely by reason of his or her handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

Rev. 04/13

46

E) Not contact, provide gratuities or advertise "free" services to Medicaid or PeachCare for Kids members for the purpose of soliciting members' requests for services. Any activity such as obtaining a list of Medicaid or PeachCare for Kids members or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members is prohibited. Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited. It is not the intent of this provision to interfere with the normal pattern of quality medical care that results in follow-up treatment. Direct contact of patients for follow-up visits is not considered solicitation, nor is an acknowledgment that the provider accepts Medicaid/PeachCare for Kids patients.

F) Allow Medicaid or PeachCare for Kids members the opportunity to choose freely among available enrolled providers. It is not the intent of this provision to preclude referrals to other enrolled providers when medically necessary.

G) Not engage in any act or omission that constitutes or results in over utilization of services.

H) Not intentionally or negligently damage or endanger the health, safety, or welfare of any Medicaid or PeachCare for Kids member.

Rev. 04/13

I) Not bill the Division for an amount greater than the lowest price regularly and routinely offered to any segment of the general public for the same service or item on the same date of service or accepted from other third party payers.

J) Neither bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered.

K) Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice.

L) Accept responsibility for every claim submitted to the Division that bears the provider's name or Medicaid/PeachCare for Kids provider number. Submission of a claim by a provider or his agent, acceptance of a Remittance Advice, or acceptance of claim payment constitutes verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division) and that the provider authorized submission of the claim for reimbursement. Remittance Advices shall be deemed accepted if the provider does not notify the Division or its third party administrator to the contrary in writing within ninety (90) days after their issuance. Payments shall be deemed accepted when cashed, negotiated, or deposited, including those payments deposited electronically.

M) Refund any overpayments to the Division within required time frames.

47

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# INCONSISTENCIES IN STATE IMPLEMENTATION OF CORRECT CODING EDITS MAY ALLOW IMPROPER MEDICAID PAYMENTS



**Suzanne Murrin**
**Deputy Inspector General for**
**Evaluation and Inspections**

**April 2016**
**OEI-09-14-00440**

**EXECUTIVE SUMMARY:  INCONSISTENCIES IN STATE IMPLEMENTATION OF CORRECT CODING EDITS MAY ALLOW IMPROPER MEDICAID PAYMENTS**
**OEI-09-14-00440**

## WHY WE DID THIS STUDY

Improper payments to healthcare providers constitute a significant vulnerability for Medicaid, costing an estimated $17.5 billion in fiscal year 2014.  Automated claims processing safeguards called "edits" are critical program integrity tools that are available to State Medicaid agencies to prevent these improper payments.  The Affordable Care Act required all States to implement the Medicaid National Correct Coding Initiative (NCCI) edits by October 1, 2010.  The NCCI edits are designed to encourage providers to code correctly by automatically denying fee-for-service Medicaid payments for services that do not meet basic medical or billing standards.

## HOW WE DID THIS STUDY

We used three data sources in our review.  We surveyed all States about their progress and experiences implementing the NCCI edits.  We asked all States to process a set of test claims to "spot check" their use of selected NCCI edits.  We received their test claims results and survey responses in November 2014.  We reviewed the cost savings estimates from the NCCI edits that States submitted to the Centers for Medicare & Medicaid Services (CMS) covering the period from January 2012 to August 2015.

## WHAT WE FOUND

The effectiveness of the Medicaid NCCI edits was limited because some States had not fully implemented them and most did not use all of the edits correctly.  States' inconsistent implementation and use of the edits may reduce their ability to promote correct coding by providers and prevent improper Medicaid payments.  Additionally, States' lack of reporting of cost savings estimates, and the limitations of the estimates that were reported, inhibit CMS's ability to meaningfully estimate national NCCI cost savings.  Despite these weaknesses, nearly all States reported that using the NCCI edits benefitted their Medicaid programs, and some voluntarily used the edits on claims paid under managed care.

## WHAT WE RECOMMEND

We recommend that CMS (1) take appropriate action to ensure that States fully implement the NCCI edits, (2) provide technical assistance to States to ensure that they use the NCCI edits correctly, (3) issue guidance to States on how to estimate NCCI cost savings and take steps to ensure that States report as required, and (4) examine whether using the NCCI edits on claims paid under managed care is beneficial, and if so, take appropriate action.  CMS concurred with all four recommendations.

# TABLE OF CONTENTS

Objectives ............................................................................................1

Background ..........................................................................................1

Methodology .......................................................................................5

Findings...............................................................................................9

    Ten States had not implemented all required NCCI edits...............9

    Most States did not use all of the NCCI edits correctly.................11

    Most States did not report NCCI cost savings to CMS as
    required, and the estimates that were reported had limited
    value ..........................................................................................13

    Eleven States voluntarily used NCCI edits on claims paid
    under managed care ......................................................................14

Conclusion and Recommendations.............................................................16

Agency Comments and OIG Response......................................................18

Appendixes .........................................................................................19

    A: Detailed Test Claims Methodology...........................................19

    B: Test Claims and Expected Results ...........................................21

    C: States That Reported Not Implementing Edits From All
    Six NCCI Edit Categories............................................................24

    D: States' Test Claim Results.......................................................25

    E: State Reporting on Adherence to Selected NCCI
    Program Requirements.................................................................26

    F: Number of Quarterly Cost Savings Estimates States
    Submitted to CMS, by Year .........................................................27

    G: States That Reported Using NCCI Edits on Managed
    Care Claims................................................................................28

    H: Agency Comments ..................................................................29

Acknowledgments..................................................................................31

## OBJECTIVES

1. To determine the extent to which States have implemented the required Medicaid National Correct Coding Initiative (NCCI) edits.

2. To determine the extent to which States used the NCCI edits consistent with NCCI program requirements.

3. To examine the extent to which States reported NCCI cost savings estimates to the Centers for Medicare & Medicaid Services (CMS), as required, and to assess the quality of the reported data.

4. To determine whether States voluntarily used the NCCI edits on Medicaid claims paid under managed care.

## BACKGROUND

Edits are automated claims processing safeguards that are available to State Medicaid agencies to help ensure program integrity.[1] According to CMS, edits that are not implemented or working properly are a primary cause of improper payments.[2] Improper payments to healthcare providers constitute a significant vulnerability for Medicaid, costing a projected $17.5 billion in fiscal year 2014.[3]

The Affordable Care Act required all States to implement the Medicaid NCCI edits by October 1, 2010.[4] The NCCI edits automatically deny payment for services that do not meet basic medical or billing standards.[5] The NCCI edits are designed to encourage providers to use the correct medical billing codes that accurately reflect the services provided to a patient. These codes determine how much Medicaid pays to providers for each service. The NCCI edits have been an effective program integrity tool in the Medicare program. Since their implementation in Medicare in

---

[1] CMS, *Comprehensive Medicaid Integrity Plan Fiscal Years 2014-2018*, p. 15.
[2] Ibid.
[3] CMS, *Medicaid and CHIP 2014 Improper Payments Reports*, p. 3.
[4] The Patient Protection and Affordable Care Act, P.L. 111-148, § 6507 (March 23, 2010), as amended by the Health Care Reconciliation Act of 2010, P.L. 111-152 (March 30, 2010), collectively known as the Affordable Care Act.
[5] CMS, *National Correct Coding Initiative Policy Manual for Medicaid Services*, Introduction p. 3, January 1, 2014.

1996, the NCCI edits have saved over $7.5 billion dollars in program expenditures through 2013.[6]

## Medicaid NCCI Edits

The NCCI edits are payment rules programmed into States' claims processing systems to automatically deny payment for ineligible and incorrectly coded services on Medicaid fee-for-service claims. For example, an NCCI edit would deny payment to a provider who bills Medicaid for more than one appendectomy on the same patient. When an NCCI edit denies payment for a service, providers may correct the coding for the service and rebill the Medicaid program, if appropriate. Ideally, over time, providers whose payments are denied because they are inconsistent with NCCI edits will code future claims correctly. The NCCI edits are based on, among other things, standard medical practice and coding conventions.[7] The NCCI edits apply only to services that are performed by the same provider, for the same beneficiary, on the same date of service.

There are two types of NCCI edits: (1) medically unlikely edits and (2) procedure-to-procedure edits. Each of the two edit types is used on claims from three types of services. Collectively, these comprise the six NCCI edit categories, as shown in Figure 1. In total, there are approximately 1.3 million NCCI edits, most of which are procedure-to-procedure edits. States may use the NCCI edits on claims paid under managed care, although it is not required.[8]

---

[6] U.S. Department of Health and Human Services, *Report to Congress on the Implementation of the National Correct Coding Initiative in the Medicaid Program,* p. 3, March 1, 2011. Testimony of Shantanu Agrawal, CMS Deputy Administrator and Director on *CMS Efforts to Reduce Improper Payments in the Medicare Program* before the Committee on Oversight & Government Reform, Subcommittee on Energy Policy, Health Care & Entitlements, United States House of Representatives, May 20, 2014.

[7] CMS, State Medicaid Director Letter, *National Correct Coding Initiative.* SMDL #10-017, September 1, 2010.

[8] Managed care covers nearly three-quarters of Medicaid enrollees. CMS, *Center for Medicaid and CHIP Services Technical Guidance on State Implementation of the Medicaid National Correct Coding Initiative Methodologies,* p. 7, October 10, 2014. CMS, *Medicaid Managed Care Enrollment Report:* Summary Statistics as of July 1, 2013. Accessed at http://www.medicaid.gov on January 26, 2016.

Figure 1:  Six Medicaid NCCI Edit Categories



| Medically Unlikely Edits |
| --- |
| 1. Practitioner Medically Unlikely Edits |
| 2. Outpatient Medically Unlikely Edits |
| 3. Durable Medical Equipment Medically Unlikely Edits |
| Procedure-to-Procedure Edits |
| 4. Practitioner Procedure-to-Procedure Edits |
| 5. Outpatient Procedure-to-Procedure Edits |
| 6. Durable Medical Equipment Procedure-to-Procedure Edits |

Source:  CMS, Medicaid NCCI Edit Design Manual, 2014.

*Medically unlikely edits*.  Medically unlikely edits prevent payment for an inappropriate number of the same service for the same beneficiary on a single day.  CMS defines the "medically unlikely value" for a service as the "maximum units of service reportable" under most circumstances, based on standard medical practice.[9]  If a provider bills for more units of service than the medically unlikely value, payment for all units of service should be denied.  According to CMS, denying payment for all units of service incentivizes providers to code correctly, because the provider must rebill for the correct number of services to receive any payment.[10]  For example, because an individual has only one gallbladder, the medically unlikely value for a gallbladder removal surgery is one.  If a provider bills for two gallbladder removal surgeries for a patient on the same day, the medically unlikely edit should deny payment for both surgeries.  The provider may then rebill for a single gallbladder removal surgery, if appropriate.

Under certain circumstances, a provider may bill for multiple services provided to a beneficiary over a period of time (date span) without specifying the specific day that each service was provided.  In these instances, the average units of service provided per day must not exceed the medically unlikely value for that service.  For example, hospital patients may receive physical therapy treatment in a whirlpool once per day.  However, hospitals may bill for more than one whirlpool treatment over the date span of the patient's stay as long as the average number of whirlpool treatments per day rounds to one or less.

---

[9] CMS, *National Correct Coding Initiative Policy Manual for Medicaid Services,* Chapter I p. I-6, January 1, 2014.

[10] CMS, *Fact Sheet: Updates on the Medicaid National Correct Coding Initiative Methodologies*, p. 4-5.  Accessed at http://www.medicaid.gov on August 12, 2015.

*Procedure-to-procedure edits.* Procedure-to-procedure edits prevent payment for pairs of services that providers should not bill together on the same day (edit pair). If a provider bills for both services in a procedure-to-procedure edit pair for the same beneficiary on the same day, the edit specifies which service should be paid and should automatically deny payment for the other service. For example, a cardiac stress test includes multiple electrocardiograms, so a provider should not bill for an electrocardiogram in addition to the cardiac stress test. In this example, the procedure-to-procedure edit should allow payment for the cardiac stress test and deny payment for any separately billed electrocardiograms.

Under limited circumstances, providers may bill for both services in a procedure-to-procedure edit pair, though they would have to include one or more modifiers on the claim to receive payment. A modifier is a two-digit code that further describes the service(s) performed, and that may allow the claim to bypass an NCCI edit. For example, an NCCI edit would not allow providers to bill for two separate surgeries on one shoulder for a single beneficiary on the same day. However, if two surgeries were performed, one on each shoulder, providers may add modifiers to the claim that would allow it to bypass the NCCI edit.[11]

### Medicaid NCCI Program Requirements

The Affordable Care Act required all States to implement the NCCI edits into their Medicaid claims processing systems.[12] Through technical guidance to States, CMS specifies how States must use the NCCI edits. NCCI program requirements include:

*Correct order to use NCCI edits during claims processing.* NCCI edits must be applied to Medicaid claims first, before applying any State-specific edits (State edits).[13] Although CMS allows States to use additional edits, applying the NCCI edits first can help promote coding consistency across Medicaid providers nationwide.

*Correct quarterly edit file for use by States.* CMS posts updated edit files for each of the six NCCI edit categories every quarter. The files are posted on the Medicaid Integrity Institute's secure Web site for States to download. States must download and use these files, rather than a similar

---

[11] Modifiers should only be used to bypass NCCI edits if documentation in the medical record supports the use of the modifier. CMS, *National Correct Coding Initiative Policy Manual for Medicaid Services,* Chapter I p. I-23, January 1, 2014.

[12] Affordable Care Act § 6507.

[13] States may use screening edits—such as those that check for Medicaid eligibility or missing information—before the NCCI edits. *Center for Medicaid and CHIP Services Technical Guidance on State Implementation of the Medicaid National Correct Coding Initiative Methodologies,* p. 16, October 10, 2014.

Advice, or acceptance of claim payment constitutes verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division) and that the provider authorized submission of the claim for reimbursement. Remittance Advices shall be deemed accepted if the provider does not notify the Division or its third party administrator to the contrary in writing within ninety (90) days after their issuance. Payments shall be deemed accepted when cashed, negotiated, or deposited, including those payments deposited electronically.

M) Refund any overpayments or Advance Payments to the Division within required time frames.

Rev. 07/04

N) Accept the Division's payment as payment-in-full for covered services to patients accepted as Medicaid or PeachCare for Kids members. In most cases, this does not prohibit the provider from receiving reimbursement for covered services from liable third parties or other insurance plan. See Section 303.5 for special rules that apply to tort cases.

O) Deduct all payments for covered services received from third parties or other insurance plans from the amount billed to the Division for covered service(s) rendered and notify the Division regarding the existence of any other insurance or third party resource unless billing for managed care co-payment.

Rev. 10/03

P) Agree not to seek or accept any payment whatsoever for covered services from the member or other interested party when the member was accepted as a Medicaid or PeachCare for Kids member. This includes managed care discounts or co-payments. (The managed care co-payments may be billed to the Division.) Further, no deposit may be required from the member or other interested party pending receipt of Division payment.

Q) Not seek reimbursement from the member or other interested party from claims submitted to the Division for which payments subsequently are denied, reduced, recouped, or refunded due to the provider's failure to comply with Divisional policies and procedures (e.g., timely submission of claims, incorrect billing, determination that services were not medically necessary, etc.) or due to the provider's receipt of payment from a third party.

Rev. 10/04

Rev. 10/06

R) Maintain such written records for Medicaid/PeachCare for Kids members as necessary to disclose fully the extent of services provided and the medical necessity for the provision of such services, for a minimum of five (5) years after the date of service. Providers should ensure that member records are forwarded to a member's new provider during a change of ownership, voluntary or involuntary termination, transfer of a member to a new provider or any other action that requires the review of member records to determine course of treatment. Member records must, at a minimum, reflect the date of service, member name and medical history, the service provided, the diagnosis and the prescribed drugs or treatment ordered, and the signature of

# EXHIBIT D

# Summary of Audit Findings by the Georgia ERO



| | | |
|---|---|---|
| **APS Healthcare** | *Legal Name of Audited Agency and PVGA #*<br>**Alliance for Change Through Treatment, PVGA #79** | **Overall Score*** |
| | *Location of Audit*<br>**3547 Habersham at Northlake Suite F. Tucker, GA 30084** | |
| | *Assigned/Associated Region/Regional Board*     *# Charts Reviewed*<br>**Region Three**     **29** | **36%** |
| | *Date Range of Audit*<br>**March 31-April 1, 2014** | |
| **Auditors** | Brianne Slover, LCSW and Mark Knopp, PsyD | |

*The Overall Score is calculated by averaging the five scores: Assessment/Re-Assessment, Treatment Planning, Documentation of Service Provision, Programmatic Integrity, and Billing. Each area accounts for 20% of the Overall Score. Audit Tool questions are derived from the DBHDD Provider Manual and the Medicaid Policies Manual.

| | Current | Previous | FY13 State Average |
|---|---|---|---|
| Assessment | 76.6% | 99% | 97% |
| Treatment Planning | 48.7% | 53.7% | 73% |
| Programmatic Integrity | 35.5% | 86% | 84% |
| Documentation of Service | 15.9% | 82.8% | 89% |
| Billing | 4.4% | 60.9% | 72% |
| **Overall** | **36%** | **76%** | **83%** |

Chart values: 65%, 71%, 76%, 36% across dates 7/24/12, 3/4/13, 10/15/13, 3/31/13

## Billing

The Billing Score is the percentage of justified billed units vs. paid / billed units for the audited billing instances. Paid Dollars are calculated based on payer: Medicaid (MRO) is the sum of paid claims; Fee-for-Service (FFS) is the sum of paid encounters; State Contracted Services (SCS) is the estimated sum based on service rates multiplied by service units.

**Score 4.4%**

### Billing Sample: Justified vs. Unjustified

**MRO Billing**



□ Justified
▨ Unjustified

**Total Billing Sample Reviewed: $53,840**

# *Summary of Audit Findings by the Georgia ERO*



| | | |
|---|---|---|
| | *Legal Name of Audited Agency and PVGA #* | **Overall Score*** |
| **APS Healthcare** | Alliance for Change through Treatment; PVGA #79 | |
| | *Location of Audit* | |
| | 3547 Habersham at Northlake Building F Tucker, Georgia 30084 | **63%** |

| *Assigned Region* | *# Charts Reviewed* | *Services Provided* |
|---|---|---|
| 3 | 24 | C&A Core and IFI |

| *Date Range of Audit* |
|---|
| September 9-11, 2014 |

| **Auditors** | Amanda Hawes, LCSW; Brianne Slover, LCSW; and Steve Hodges, LPC |
|---|---|

*The Overall Score is calculated by averaging the five scores: Assessment/Re-Assessment, Treatment Planning, Documentation of Service Provision, Programmatic Integrity, and Billing. Each area accounts for 20% of the Overall Score. Audit Tool questions are derived from the DBHDD Provider Manual and the Medicaid Policies Manual.*

| | Current | Previous | FY14 State Average |
|---|---|---|---|
| Assessment | 90% | 76.6% | 98.7% |
| Treatment Planning | 59.2% | 48.7% | 79.3% |
| Programmatic Integrity | 77.1% | 35.5% | 81.7% |
| Documentation of Service | 87.8% | 15.9% | 91.9% |
| Billing | 0% | 4.4% | 77.4% |
| **Overall** | **63%** | **36%** | **86%** |

Chart (dates: 3/4/13, 10/15/13, 3/31/14, 9/9/14): 71%, 76%, 36%, 63%

## Billing

*The Billing Score is the percentage of justified billed units vs. paid / billed units for the audited billed claims. Paid Dollars are calculated based on payer: Medicaid (MRO) is the sum of paid claims; Fee-for-Service (FFS) is the sum of paid encounters; State Contracted Services (SCS) is the estimated sum based on service rates multiplied by service units.*

**0%**

### Billing Sample: Justified vs. Unjustified

**Combined Billing**



◨ Justified
▩ Unjustified

**Total Billing Sample Reviewed: $11,573**

# *Summary of Audit Findings by the Georgia ERO*



| | Legal Name of Audited Agency and PVGA # | | Overall Score* |
|---|---|---|---|
| APS Healthcare | **Alliance for Change Through Treatment, LLC PVGA #79** | | |
| | *Location of Audit* | | |
| | **3547 Habersham at Northlake Building F Tucker, GA 30084** | | **0%** |
| | *Assigned Region* / *# Charts Reviewed* / *Services Provided* | | |
| | 3 / 25 / **C&A Core, IFI** | | |
| | *Date Range of Audit* | | |
| | **April 28, 2015** | | |

| Auditors | Amanda Hawes, LCSW; Mark Knopp, PsyD; Steve Hodges, LPC |
|---|---|

*The Overall Score is calculated by averaging the five scores: Assessment/Re-Assessment, Treatment Planning, Documentation of Service Provision, Programmatic Integrity, and Billing. Each area accounts for 20% of the Overall Score. Audit Tool questions are derived from the DBHDD Provider Manual and the Medicaid Policies Manual.*

| | Current | Previous | FY14 State Average |
|---|---|---|---|
| Assessment | 0% | 90% | 98.7% |
| Treatment Planning | 0% | 59.2% | 79.3% |
| Programmatic Integrity | 0% | 77.1% | 81.7% |
| Documentation of Service | 0% | 87.8% | 91.9% |
| Billing | 0% | 0% | 77.4% |
| **Overall** | **0%** | **63%** | **86%** |

Chart data points: 10/15/13: 76%; 3/31/14: 36%; 9/9/14: 63%; 4/28/15: 0%

## Billing    **0%**

*The Billing Score is the percentage of justified billed units vs. paid / billed units for the audited billed claims. Paid Dollars are calculated based on payer: Medicaid (MRO) is the sum of paid claims; Fee-for-Service (FFS) is the sum of paid encounters; State Contracted Services (SCS) is the estimated sum based on service rates multiplied by service units.*

### Billing Sample: Justified vs. Unjustified

**MRO Billing**



☐ Justified
⊠ Unjustified

**Total Billing Sample Reviewed: $25,327**



**APS Healthcare, Inc.**
## POLICIES & PROCEDURES
External Review Organization for Georgia's Behavioral Health, and
Developmental Disability Service System

documented in an Exit Interview form signed by the APS Auditor and an agency representative. A copy of the Exit Interview form will be left with the provider agency.

3. Following the audit, APS prepares a written Audit summary of all findings. This audit summary is sent to the provider, the regional and state DBHDD offices, and the Department of Community Health (DCH).
4. For Ad Hoc or unannounced audits findings, providers have an option of a Level I audit appeal only. *(See Audit Appeals P&P for more details).*



**APS Healthcare, Inc.**
## POLICIES & PROCEDURES
External Review Organization for Georgia's Mental Health,
Developmental Disability and Addictive Disease Service System

4. Following the Audit, APS prepares a written Audit summary of all findings. This audit summary is sent to the provider, the regional and state DMHDDAD offices, and the Department of Community Health (DCH).

5. For Ad Hoc or unannounced audits findings, providers have an option of a Level I audit appeal only. *(See Audit Appeals P&P for more details).*



**APS Healthcare, Inc.**
# POLICIES & PROCEDURES
External Review Organization for Georgia's Mental Health,
Developmental Disability and Addictive Disease Service System

| SUBJECT: | Unannounced or Ad Hoc Audits |
|----------|------------------------------|
| ISSUED: | 1/2006 |
| REVISED: | |
| REVIEW ON: | 9/2006, 2/2007, 2/2008 |

**POLICY**          Ad Hoc Audits

Included in APS Healthcare, Inc. GA ERO contract is the responsibility to conduct routine record audits of providers contracted by the state to provide MHDDAD services. Components of this contract include the review of provider billing practices and clinical documentation against the state service guidelines, provider manual, and evidenced based best practices. Ad Hoc or unannounced audits can be triggered by a cumulative audit score of 60% or less for 2 or more consecutive audit cycles, specific provider programs not meeting DMHDDAD service guideline requirements, or based on priority and at the discretion of the Division of MHDDAD.

**DEFINITIONS**

**AD HOC AUDITS** – The unscheduled record review of providers identified to provide services with the Division of MHDDAD.

**PROVIDER -** An agency identified by the state to provide MHDDAD services

**DMHDDAD -** The State of Georgia Division of Mental Health, Developmental Disabilities and Addictive Diseases.

**PROCEDURES**

1. As part of the provider audit process, APS Trainer/Auditor staff will review documentation in the consumer medical record of services provided/documented by a provider against the state DMHDDAD Service Guidelines unannounced, or with no more than three (3) days notice to the provider, when requested by the DMHDDAD.

2. All inconsistencies between services provided/documented and standards outlined in the state DMHDDAD Service Guidelines will be noted and scored in the audit tool. *(See APS GA ERO Provider Handbook for more details regarding the Ad Hoc Billing Audit)*

3. APS Trainer/Auditor staff verbally review audit findings with the provider in their Exit Interview. This includes the identification of billing instances where potential abusive or fraudulent practices may exist. Additionally, APS staff may make recommendations for improved practices and/or recoupment of payment.



APS Healthcare, Inc.
# POLICIES & PROCEDURES
External Review Organization for Georgia's Behavioral Health, and
Developmental Disability Service System

| SUBJECT: | Unannounced or Ad Hoc Audits |
|---|---|
| ISSUED: | 1/2006 |
| REVISED: | 9/2009 |
| REVIEW ON: | 9/2006, 2/2007, 2/2008, 2/2009 |

## POLICY        Ad Hoc Audits

Included in APS Healthcare, Inc. GA ERO contract is the responsibility to conduct routine record audits of providers identified by the state to provide BHDD services. Components of this contract include the review of provider billing practices and clinical documentation against the DBHDD Provider Manual, Medicaid Manual and evidenced based best practices. Ad Hoc or unannounced audits can be triggered by a cumulative audit score of less than 70% for 3 or more consecutive audit cycles, specific provider programs not meeting DBHDD Provider Manual requirements, or based on priority and at the discretion of the Division of BHDD.

## DEFINITIONS

**AD HOC AUDITS –** The unscheduled record review of providers identified to provide services with the Division of MHDDAD.

**DBHDD -** The State of Georgia Division of Mental Health, Developmental Disabilities and Addictive Diseases.

**PROVIDER -** An agency identified by the state to provide MHDDAD services

## PROCEDURES

1. As part of the provider audit process, APS Auditor/Trainer staff will review documentation in the consumer medical record of services provided/documented by a provider against the DBHDD Provider Manual, Medicaid Manual and evidenced based best practices. Additionally, Ad Hoc audits may include contact with families or collaborating agencies. This audit will be unannounced, or with no more than three (3) days notice to the provider, when requested by the DBHDD.

2. APS Auditor/Trainer staff verbally review audit findings with the provider in their Exit Interview. The Auditor will note all inconsistencies and unjustified billing. Additionally, APS staff may make recommendations for improved practices. This information will be



**APS Healthcare, Inc.**
# POLICIES & PROCEDURES
External Review Organization for the Georgia
Department of Behavioral Health and Developmental Disabilities

| SUBJECT: | **Unannounced or Ad Hoc Audits** |
|---|---|
| ISSUED: | 1/2006 |
| REVISED: | 6/2013 |
| REVIEW ON: | 9/2006, 2/2007, 2/2008, 2/2009, 4/2010, 6/2013 |

POLICY          Ad Hoc Audits

Included in APS Healthcare, Inc. GA ERO contract is the responsibility to conduct routine record audits of providers identified by the state to provide BHDD services. Components of this contract include the review of provider billing practices and clinical documentation against the DBHDD Provider Manual, Medicaid Manual and evidenced based best practices. Ad Hoc or unannounced audits can be triggered by a cumulative audit score of less than 70% for 3 or more consecutive audit cycles, specific provider programs not meeting DBHDD Provider Manual requirements, or based on priority and at the discretion of the Division of BHDD.

DEFINITIONS

**AD HOC AUDITS** – The unscheduled record review of providers identified to provide services with the Department of BHDD.

**DBHDD** - The State of Georgia's Division of Behavioral Health and Developmental Disabilities.

**PROVIDER** - An agency identified by the state to provide BHDD services

PROCEDURES

1. As part of the provider audit process, APS Auditor/Trainer staff will review documentation in the consumer medical record of services provided/documented by a provider against the DBHDD Provider Manual, Medicaid Manual, and evidenced based best practices. Additionally, Ad Hoc audits may include contact with families or collaborating agencies. This audit will be unannounced, or with no more than three (3) days notice to the provider, when requested by the DBHDD.

2. APS Auditor/Trainer staff may verbally review audit findings with the provider in their Exit Interview. The Auditor will note all inconsistencies and unjustified billing. Additionally, APS staff may make recommendations for improved practices. This information may be documented in an Exit Interview form signed by the APS Auditor



APS Healthcare, Inc.
## POLICIES & PROCEDURES
External Review Organization for the Georgia
Department of Behavioral Health and Developmental Disabilities

and an agency representative.  If an exit interview is conducted, a copy of the Exit Interview form will be left with the provider agency.

3. Following the audit, APS prepares a written Audit summary of all findings.  This audit summary is sent to the regional and state DBHDD offices, and the Department of Community Health (DCH), and may be sent to the provider. It may be posted to the APS Knowledgebase at www.apsero.com.

4. For Ad Hoc or unannounced audits findings, providers may have an option of a Level I audit appeal only. *(See Audit Appeals P&P for more details).*



APS Healthcare, Inc.
# POLICIES & PROCEDURES
External Review Organization for the Georgia
Department of Behavioral Health and Developmental Disabilities

| SUBJECT: | Unannounced or Ad Hoc Audits |
|---|---|
| ISSUED: | 1/2006 |
| REVISED: | 8/2014 |
| REVIEW ON: | 9/2006, 2/2007, 2/2008, 2/2009, 4/2010, 6/2013, 8/2014 |

POLICY          Ad Hoc Audits

Included in APS Healthcare, Inc. GA ERO contract is the responsibility to conduct routine record audits of providers identified by the state to provide BHDD services. Components of this contract include the review of provider billing practices and clinical documentation against the DBHDD Provider Manual, Medicaid Manual and evidenced based best practices. Ad Hoc or unannounced audits can be triggered by a cumulative audit score of less than 70% for 3 or more consecutive audit cycles, specific provider programs not meeting DBHDD Provider Manual requirements, or based on priority and at the discretion of the Department of BHDD.

DEFINITIONS

**AD HOC AUDITS** – The unscheduled record review of providers identified to provide services with the Department of BHDD

**DBHDD** - The State of Georgia's Department of Behavioral Health and Developmental Disabilities.

**PROVIDER** - An agency identified by the state to provide BHDD services

PROCEDURES

1. As part of the provider audit process, APS Auditor/Trainer staff will review documentation in the consumer medical record of services provided/documented by a provider against the DBHDD Provider Manual, Medicaid Manual, and evidenced based best practices. Additionally, Ad Hoc audits may include contact with families or collaborating agencies. This audit will be unannounced, or with no more than three (3) days notice to the provider, when requested by the DBHDD.

2. APS Auditor/Trainer staff may verbally review audit findings with the provider in their Exit Interview. The Auditor will note all inconsistencies and unjustified billing. Additionally, APS staff may make recommendations for improved practices. This information may be documented in an Exit Interview form signed by the APS Auditor

Ad Hoc Audits P&P                                                                                    Page 1 of 2

# EXHIBIT E

PH (678) 406-9787    FAX (678) 406-9887

**Alliance for
Change through
Treatment**

MENTAL HEALTH GEORGIA

Georgia Department of Community Health
Lea Lee
Benefits Recovery Section
2 Peachtree Street NW
Atlanta Georgia. 30303-3159

November 3, 2016

Ref: OIG 1502344

Ms. Lee,

Per your phone call on November 2, 2016, I a resubmitting the Extended Repayment Plan Request for Alliance for Change through Treatment in regards. At this time Alliance for Change through Treatment is requesting the EXTENDED PAYMENT PLAN in order to repay the amount of **$42,634.37** for a period of **12 months**.

Per your communication within your memo dated. DCH Policy Number 800.5.1, Section 3 named Procedures: *Providers seeking to obtain an extended repayment schedule shall first complete the "Provider Request for Extended Repayment Schedule" form available on the DCH website. Completed forms should be forwarded to the email address indicated on the form.* ~~[redacted]~~

As it relates to the additional outstanding amounts, allegedly owed, I have contacted Hewlett Packard to obtain proof and explanation of all outstanding dollar amounts. I spoke with their representative three times and she was unable to determine why or how the amount was determined. The HP representative did state, the agency was penalized for NCCI submission timeframes, but checked the extended timeframe, which was provided to ALL providers for NCCI resubmission, verifying the agency's submissions were submitted timely.

There are several discrepancies in the total alleged amount owed. Until clarity is provided, in reference to the additional remaining amount IF ANY, the ability to determine the amount of each, weekly required payment, within the 12 month timeframe, is not feasible at this time.

In closing, your department was previously notified of Alliance for Change through Treatment completing a recent Administrative Hearing, involving the correct requested payback of **$22,372.05**. The final outcome of this hearing, involving the payback amount of $22,372.05 has not yet been determined.

Please notify within the above timeframe of our status. It is requested all communication be sent to the following email addresses: Cassandra@mentalhealthgeorgia.com and thcrness@aol.com.

Thank You,

Cassandra Johnson-Fander
CEO

Cc: Dorian Murry, Attorney

File

3543 Habersham at Northlake, Bldg. F
Tucker, GA 30084-4005